NicholsoN, C. J.,
delivered tbe opinion of the-court.
The complainants being judgment creditors of defendants Wm. Paris & Co., filed this bill, alleging that the defendant R. C. Brinkley is indebted to Wm. Paris & Co. for a balance on a contract for building the De Soto Block in Memphis, and paying for and obtaining an attachment of this balance. Brinkley answered, and admitted that there were due to Wm. Paris & Co. ■on the contract price for said building about $2,722, but stated that Wm. Paris & Co. were indebted to him in a larger amount, as damages for their failure to complete the building within the time prescribed by the contract. The complainants then filed their amended bill, alleging that Wm. Paris & Co. were delayed in the •completion of the building, in consequence of the default of the parties employed to perform the iron front portion of the work, and that these parties took their •contract with the defendant Brinkley, and those interested with him as owners of the property, and therefore that Faris & Co. were not responsible for the ■delay, or liable for damages therefor.
Brinkley answered, denying that the contract for the iron front was made by him and the other owners with any other contractors than Wm. Paris & Co., and insisting that that they were as much bound to have the iron portion as the residue of the work completed within the time prescribed.
The complainants requested the empanelling of a jury by the Chancellor, which was ordered, and two issues of fact were submitted to them; viz.:
1. What amount, if any, remains due and unpaid *454 •to W'm. Faris by K. C. Brinkley, by reason of work done by said Wm. Faris & Co. '«
2. Whether It. C. Brinkley is entitled to any re-coupment or set-off against said Wm. Faris by reason of failure on their part to construct and complete the building within the time contracted — and if so, what amount ?
Upon the trial of these issues, under the charge of the Chancellor, the jury found that there was a balance due to Wm. Faris & Co. of $2,722, and that Brinkley was entitled to damages against Wm. Faris & Co. to the amount of $3,000. Thereupon the cause was finally heard, and as the Chancellor was satisfied with the finding of the jury, he held that nothing was due to the complainants, and dismissed the bill.*
The complainants have appealed, having tendered their bill of exceptions, which was signed by- the Chancellor.
It appears from the evidence set out in the bill of exceptions, that the cast-iron work of the buildings was performed by Street & Hungerford, and that the delay in the completion of the work beyond the time fixed by the contract was produced by their failue to perform that part of the work in proper time.
This being proved, the complainants contended that Street & Hungerford were employed by Brinkley and the other owners, to do the cast-iron work; that they *455 were the employees of' the owners and not of Wm. Earls & Co., who could not complete their work in time, in consequence of the failure of Street & Hungerford, over whom they had no control, but who were subject only to the direction and control of Brinkley and the other owners, through their architects.
There is much proof going to show that Wm. Earis & Co. had no control over the cast-iron work, but that it was exclusively under the control of Street & Hun-gerford, who were subject to the direction of the architects employed by Brinkley and the other owners. There is also proof going to show that when the the contract was executed, it was understood between Wm. Faris & Co. and Munford, who drew the contract and signed it for himself, the Insurance Company, and Tate and Brinkley, who were then the owners of the property, that Wm. Faris & Go. were not to be held responsible for the failure of Street & Hunger-ford to execute the cast-iron part of the work in time; and that such was the meaning of the contract. It was proved by Munford, that it was at his instance that Street & Hungerford got the cast-iron work. Foster, one of the architects, proved that Wm. Faris & Co. wished to make a separate contract for the cast-iron work, but the witness did not know that one was actually made; but he did know that Wm. Faris & Co. had nothing to ■ do with the manner of construction of the iron work. He says that Wm. Faris & Co. did not advise or suggest, or have anything to do with it; that the architects never consulted them about it. The witness says that he stopped the brick and wood work until il e iron work *456 was up, and that the work was delayed several months by reason of the iron work. The work was not completed until four or five months after the time. It was acocepted by the parties. The witness would not say that it was accepted by the architects. The architects did not waive the delay in the building, but did accept the building after the delay.
Jt was also proved that all the owners of the property paid up their portions of the contract price, except Brinkley, who refused to pay his, because he claimed damages.
Upon this evidence, in connection with other circumstances which might be referred to, we cannot resist the conclusion, that Wm. Faris & Co., and Munford who represented the owners, and the archieeets of the owners, who superintended and controlled the work, all understood that, by the proper meaning of the contract, Street & Hungerford were under the direction and control of the owners or their architects, in executing the iron work, and not under the direction and control of Wm. Faris & Co., and that Wm. Faris & Co. were not to be held responsible for the delay produced by Street & Hungerford in completing the iron work. But it was in proof that the building was done by Wm. Faris & Co. under a written contract; and when the Chancellor came to charge the jury in response to a request of the complainant’s counsel, he declined to charge as requested, but stated to the jury that as the contract was free from ambiguity and by its terms bound Wm. Faris & Co. to have the whole building completed within the time specified in *457 the contract, and made them liable in damages for failure to do so, whether such failure was caused by delay in furnishing the iron work, or from any other cause, therefore the court refused either to consider the testimony for itself, or to permit the jury to consider it, in ascertaining the intention and meaning of the contract in any respect.
The testimony here referred to by the Chancellor, which he refused to consider himself and refused to allow the jury to consider, in ascertaining the meaning of the parties to the contract, was tlie • circumstances under which the contract was made, and which surrounded the parties at the time, and what the parties said at the time. The reason given by the Chancellor for refusing to consider this testimony was, that he considered the contract free from ambiguity.
As it is the province of the court to construe contracts and to declare their meaning, there was no error in excluding this evidence from the jury; but it is the well settled rule in this State, that the governing principle of construction is the intention of the parties, and that this intention may be ascertained by looking to the situation of the parties, the motive which induced the agreement, and the objects and purposes designed to be effected by it, — the sole object of the court being to do justice between the parties, by enforcing a performance of their agreement, according to the sense in which they mutually understood it at the time it was made.
In determining whether the Chancellor’s construction of the contract developed the intention of the *458 parties, and the sense in which they mutually understood it at the time it was made, we must look to the whole instrument, and interpret the language in view of the situation of the parties, the motives which induced the agreement, and the objects and purposes designed to be effected.
It appears that Brinkley, Tate, and others,, owned valuable real estate in Memphis, on which they desired to have business houses erected, by the 1st of October, 1860. They deemed it important to make a contract which would secure-the completion of the work by that time. ¥m. Faris & Co. were contractors, and were willing to undertake the work. It was on the 4th June, 1860, when the terms of the contract were agreed upon; but it seems not to have been signed by the parties until the 12th of that month. It was a heavy undertaking, and was to be completed in less than four months. The contractors were, at their own cost, to find, provide, and deliver all the materials necessary to enable them to complete the work in a manner satisfactory to the architects who were employed by the owners to superintend the work. Detailed drawings and specifications were prepared and made a part of the contract. The architects were at liberty to make any deviation from or alteration in, the form, plan, construction, detail, and execution, described by the drawings and specifications, without invalidating the contract. The opinion of the architects, and their report and decision on all matters, were to be binding and conclusive. By written order, the architects might cause the con *459 tractors to suspend work upon such portions of the building as they might think proper, in order to se-seure the proper execution of the work connected therewith. The several works were to be proceeded in with all reasonable dispatch in the several parts, consistently with the due and proper execution thereof. The contractors agreed to perform all the work and to complete the buildings for $25,000, and they further agreed to give the cast-iron work to Street & Hun-gerford, and the brick work to W. H. Grider; and that if the buildings were not delivered into possession of the owners by the 1st of October, 1860, then they should pay the owners $100 for every day of delay, not as a penalty to enforce the contract, but as liquidated damages. In consideration thereof, the owners agreed to pay to the contractors, on the certificate of the architects, $25,000 in the following manner; viz.: $3,600 thereof to be paid to Street & Hungerford, to satisfy their claim for the iron work, etc.
The first remark to be made in reference to this contract is, that the architects are recognized throughout as having unlimited discretion in controlling and superintending the execution of the work. They could make such alterations or modifications as they chose in all matters. Their opinion, or report, or order, was binding and conclusive on the contractors. The architects were the agents and representatives of the owners. It follows that in legal effect the contractors had no discretion in the execution of the work, but were subject all the time to the control o. the owners, through their agents the architects. Whatever *460 was done by the architects, was done as the agents of the owners, and the owners must be regarded as responsible. But with this unlimited power of control reserved to the owners, through their agents, plainly expressed in the contract, the contractors agreed to execute the work under such control, and to complete it by a given day. They were therefore bound to take the consequences unless they have shown that the delay in completing the work was produced by no fault on their side, but by the action of the owners or their agents. It is to be fairly implied that in reserving to themselves the control and superintendence •of the work, their power was not to be so exercised as to prevent the contractors from completing the work within the time fixed by the contract. Otherwise, they are entitled to compensation for their work •done. 2 Smith’s Leading Cases, 43; 2 Parsons on Contr., 676.
As already stated, it is in proof that the delay in the completion of the building was the result of the failure of Street & Hungerford to have the iron work •executed in time. The architect, as he had the power to do, suspended the brick and wood work until the iron work was advanced, in order that the buildings might be safely and properly constructed. If Street & Hungerford were the employees of the contractors and subject to their control, then it is clear that they were- responsible for the default of Street & Hungerford, and therefore the fact that the brick and wood work was suspended and delayed by the architect would be no excuse to the contractors for the delay.
*461 But if, on the other hand, Street & Hungerford were the employees of the owners, and subject to their control, and not to that of the contractors, then the failure of Street & Hungerford to have the iron work ready in proper time, and the order of the architect suspending the brick and wood work on account of the default of Street & Hungerford, ought not to be visited on the contractors, unless by the terms of the contract they were responsible for the failure of Street & Hungerford, notwithstanding they were the employees of the owners, and not of the contractors. It becomes necessary, therefore to examine the language of the contract, to determine whether we can ascertain the intention of the contracting parties as to the relation which Street & Hungerford bore to them; that is, whether they were the employees, and under the control of, the contractors or the owners.
By the first stipulation of the contract, the contractors “ agree to do and perform all the work of every kind mentioned and contained in the foregoing sepecifieations, ... at and for the sum of §25,000.” Then follows the next stipulation by the contractors: “And the said party of the second part (the contractors) do further agree to give the cast-iron work to Street & Hungerford, and the brick work to W. H. Grider.”
Among the stipulations assumed by the owners was-this, that “ upon the certificate of the architects, they would pay the aforesaid sum of $25,000 in the following manner; viz.: $3,600 thereof is to be paid to Street & Hungerford, to satisfy their claim for the *462 iron work; when the said work is all completed and accepted by the architects.” There is no ambiguity or uncertainty in the first stipulation. The contractors undertook to perform all the work specified (the iron work included) and to be paid $25,000. Of course, it was immaterial whether they performed the work themselves, or by their servants or employees. Their undertaking was to perform it all, or have it performed. If there is uncertainty in the contract, it is produced by the next stipulation, which binds the contractors “to give the iron work to Street & Hungerford,” and by, the stipulation of the owners, to pay Street & Hungerford for the iron work $3,600.
The language of these several stipulations may mean that the contractors are to perform all the work for $25,000, employing Street & Hungerford to do the iron work at $3,600, which the owners agree to pay directly to Street & Hungerford; or it may mean that the contractors are to perform all the work for $25,000, but the iron work was to be given to Street & Hungerford, because the owners have employed them to do it $3,600, which is to be paid to Street & Hungerford, and deducted from the $25,0(0. We think that the language of the contract, taken all together, may .bear either construction, and therefore that it is uncertain on- the face of it what was the sense in which the parties understood it at the time when the contract was executed. .
Mr. Parsons in his work on Contracts, Vol. 2, p. 564, lays down this rule in the interpretation of contracts:—
*463 ' “If the meaning of the instrument, by itself, is affected with uncertainty, the intention of the parties may be ascertained by extrinsic testimony, and this intention will be taken as the meaning of the parties expressed in the instrument if it be a meaning which may be distinctly derived from a fair and rational interpretation of the words actually used.”
The extrinsic testimony in this case shows that Munford, who prepared the contract, and executed it for the owners, procured the employment of Street & Hungerford to do the iron work. That a.t the time of the making of the contract, the contractors were not to be responsible for any default of Street & Hungerford. That the architects looked alone to Street & Hungerford in the execution of the iron work, regarding the contractors as having nothing to <io with the iron work; and that all the owners had paid up their portions of the contract, claiming no damages, except Brinkley, who alone i’efused, on account of the damages resulting from the delay. From this testimony, it results that Street & Hun-gerford were the employees of the owners, and that the contractors were not responsible for the delay in the execution of the iron work; and we are of opinion that this may be fairly deduced as the meaning of the contract from its language.
It follows that the Chancellor erred in excluding from consideration the extrinsic testimony, and that upon this testimony the contractors were not responsible for the delay caused by the failure of Street & Hungerford to execute the iron work in proper time.
*464 The decree of the Chancellor is therefore reversed, and a decree awarded for the amount found by the jury to be due the contractors.
The costs will be paid by Brinkley.

 Code, sec. 4469, provides as to such trials: — “The trial shall be conducted like other jury trials at law, the finding of the jury having the same force and effect, and the court having the same p wer and control over the finding: as on such trials at law.”